IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSEPHINE V. LEYBA, substituting for
Jesús Leyba, Deceased,

      Plaintiff,

vs.                                                                                                No. CIV 05-1248 RLP

JO ANNE B. BARNHART,
Commissioner of the Social Security Administration,

      Defendant.

**Memorandum Opinion and Order**

This is an appeal from a final decision of the Defendant Commissioner under the Social Security Act. This court has jurisdiction pursuant to §42 U.S.C. 405(g).

**Procedural Background**

Jesús Leyba filed applications for Disability Income Benefits and Supplement Security Income on May 27, 2003, alleging disability commencing March 31, 2001 due to severe low back pain. (Tr. 49-51, 410-412, 61). His applications were denied on September 16, 2003. (Tr. 31, 413). He sought reconsideration alleging additional and/or more explicit physical impairments and depression. (Tr. 91-94, 103). His applications were again denied on April 1, 2004. (Tr. 32, 415). Mr. Leyba appeared at a hearing before an administrative law judge ("ALJ" herein) on October 24, 2004. (Tr.421-446). On January 20, 2005, Mr. Leyba's claims were denied in a decision authored by an ALJ who did not conduct and was not present at the administrative hearing. (Tr. 15-23). Mr. Leyba sought review by the Appeals Council. (Tr. 13-14). He died during the pendency of the Appeals Council's review. (Docket No. 13, p. 5). The Appeals Council declined review. (Tr. 6). The decision of the ALJ stands as the final decision of the Commissioner of Social Security. *Reyes v. Bowen*, 845 F.2d 242,

244 (10th Cir. 1988).  Josephine V. Leyba, filed this suit seeking to reverse the decision of the Commissioner.  She is the widow of Jesús Leyba, and is substituted for him as Plaintiff in this action.  Jesús Leyba will be referred to as "Plaintiff" in this opinion.

### **Standard of Review**

Judicial review under 42 U.S.C. §405(b) is limited to whether the Commissioner's decision is supported by substantial evidence in the record as a whole and whether the Commissioner applied the correct legal standards.  *See White v. Massanari*, 271 F.3d 1256, 1257 (10th Cir.), (citing *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th Cir. 1994).

Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971), (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  (citation omitted).  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significant evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996).

Although the court does not reweigh the evidence or try the issues *de novo*, *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir.1993), it will meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir.1994).

**Five Step Sequential Evaluation Process.**
**and the ALJ's Findings**

An ALJ is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled. *Williams vs. Bowen*, 844 F.2d 748, 750-52 (10th Cir.1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 & n. 2. At step one, the claimant must show "that he is not presently engaged in substantial gainful activity;" at step two "that she has a medically severe impairment or combination of impairments;" at step three that the impairment is equivalent to a listed impairment; and at step four, "that the impairment or combination of impairments prevents him from performing his past work." *Id.* at 750-52. If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given his age, education and work experience. *See id.* at 751 & n. 2.

The ALJ found that Plaintiff was not engaged in substantial gainful activity; that his back condition caused a severe impairment, but his depression was not severe; that his impairment did not meet or equal a listed impairment; that he had the residual functional capacity ("RFC" herein) for light work, and could not return to his past relevant work; that considering Plaintiff's vocational factors and his RFC for light work, application of the Medical-Vocational Guidelines ("Grids" herein) directed a finding of not disabled.

**Factual Background**

Plaintiff was born on April 1, 1957. (Tr. 49). He had either an 11th or 12th grade education. (Tr. 67, 154A). His relevant work experience was as a heavy equipment operator. (Tr. 428). He

injured his back in February 1997[1] and was off work for eight months. (Tr. 400, 14, 332).

Plaintiff sustained a second back injury on November 6, 1999. (Tr. 61, 402, 398, 219). An MRI obtained on November 16, 1999, noted minimal degenerative change of discs L4-5 with some disc desiccation and mild diffuse disk bulge causing some impingement on the neuroforamina. (Tr. 393-394).

Plaintiff saw several doctors complaining of back pain. (See e.g., Tr. 216, 238, 207-211). Dr. Brian Dellahoussaye became his treating physician in January 2000. Dr. Dellahoussaye felt Plaintiff could perform light work despite documented abnormalities on physical examination.[2] (Tr. 324-328, 323, 316, 310, 303). He administered an epidural block, ordered physical therapy and prescribed Vicodin[3] and Neurontin for pain management. (Tr. 324-328). A discogram[4] of the lumbar spine performed on March 23, 2000, indicated no tear or herniation. (Tr. 237, 295-300). Dr. Delahoussaye released Plaintiff to work with no limitations in April 2000. (Tr. 293).

Plaintiff returned to work, but his complaints of pain continued. A repeat discogram obtained on September 27, 2000 demonstrated a diffuse leak at L4-5 with concordant pain response. (Tr. 230). His treating physician, Dr. Michael Woods, indicated that he was unable to work, prescribed

---

[1] This injury was diagnosed as lumbar sprain, with minimal L4-5 disc bulge and facet arthritis. (Tr. 262, 401,152) .

[2] Reduced range of motion in forward flexion and extension, pressure over hip producing low back pain, mildly positive straight leg raise on left, tenderness over L4-5.

[3] Combination of a narcotic (Hydrocodone bitartrate) and a non-narcotic (Acetaminophen) used for the treatment of moderate to moderately severe pain. *1999 Physicians' Desk Reference*, p. 1486.

[4] An enhanced x-ray examination of the intervertebral discs, during which dye is injected into the center of the injured disc(s). Used to determine which disc has structural damage and whether it is causing pain. http://www.allaboutbackpain.com/html/spine_diagnostics/spine_diagnostics_discogram.html

Percocet[5], and recommended intradiscal electrothermal annuloplasty[6] ("IDET" herein).  Id.

Dr. Delahoussaye concurred that Plaintiff was incapacitated, assuming that the discogram obtained in September 2000 showed pain emanating from the L5-S1 level.  (Tr. 143-144).  After reviewing the discogram Dr. Delahoussaye felt Plaintiff should have IDET at L5-S1 to treat discogenic low back pain. (Tr. 142).  As of March 1, 2001 Dr. Delahoussaye released Plaintiff to light duty work  (Tr. 140, 271).  However, the following month he provided Plaintiff with a handicapped placard. (Tr. 139).

Dr. Delahoussaye referred Plaintiff to Stephen Chiulli, PhD, for psychological evaluation prior to surgery.  (Tr. 138).  Dr. Chiulli administered an MMPI-2 in July 2001 which documented significant levels of depression likely to impact surgical outcome.  He recommended treatment for depression, and Plaintiff was placed on anti-depressant medication. (Tr. 225-226, 137).

Plaintiff was examined by Edwin Kennedy, M.D., an associate of Dr. Delahoussaye, on August 8, 2001.  His physical examination was unchanged from prior evaluations, with complaints of significant low back pain and difficulty sleeping noted.  Dr. Kennedy counseled Plaintiff about IDET, and indicated that he was at that point "totally incapacitated from a medical point of view," and that recovery from the IDET could take up to 12 weeks.  (Tr. 134).

IDET was performed on November 27, 2001, by Dr. Woods.  (Tr. 242).  A two-level procedure was attempted, but was successful at only the L4-5 level.  (Tr. 243).  Dr. Woods saw

---

[5]A combination of a narcotic (Oxycodone) and a non-narcotic (Acetaminophen) used for the treatment of moderate to moderately severe pain. *1999 Physicians' Desk Reference*, p. 984.

[6]A minimally invasive back surgery to treat patients with chronic low back pain caused by tears or small herniations of their lumbar discs. http://www.spine-health.com/dir/idet.html.  Heat is applied to the painful disc by means of a catheter in order to kill the nerve fibers and toughen the disc tissue, sealing any small tears.  http://www.webmd.com/hw/back_pain/tn9268.asp.

Plaintiff on one occasion post-operatively on December 10, 2001, and noted that there was no improvement, which he stated was not surprising. He further indicated that if Plaintiff was not improved in 6-12 weeks, he would recommend a fusion with some fairly heavy restrictions. (Tr. 104). Dr. Woods, who was leaving the state, referred Plaintiff to Dr. Michael Willis for follow up care. Id.

Dr. Delahoussaye examined Plaintiff on February 6, 2002, and documented persistent low back pain. He indicated Plaintiff could return to work, but was inconsistent as to what exertional level. (Tr. 131-132). He changed Plaintiff's pain medication to Darvocet N 100[7]. Id. On March 21, 2002, Dr. Delahoussaye stated that Plaintiff was capable for performing light work with lifting limited to 20 pounds. (Tr. 130).

Plaintiff went to Dr. Willis on April 4, 2002, reporting no improvement in pain complaints since the IDET. Dr. Willis's physical examination found no focal neurological deficit, moderate limitation in range of motion of the lumbar spine and mildly antalgic gait. He also noted that Plaintiff was in significant discomfort rising from the examining chair and table. Dr. Willis, who was leaving his medical practice, referred him to Dr. Robinson.[8] (Tr. 106).

Dr. Delahoussaye examined Plaintiff on August 19, 2002. Despite minimal physical findings Dr. Delahoussaye credited Plaintiff's complaints of pain, and prescribed two narcotic pain medications, Hydrocodone 5/500 and Darvocet N -100. He also referred Plaintiff to the Department of Vocational Rehabilitation. (Tr. 126).

---

[7]A narcotic medication used to treat mild to moderate pain. *1999 Physicians' Desk Reference*, p. 1567.

[8]When Plaintiff saw Dr. Robinson on December 27, 2002 he was advised that the doctor was no longer taking spine patients. (Tr. 105).

6

Plaintiff was evaluated in October and November 2002 by doctors at the University of New Mexico Hospital. An MRI located a small 4-5 disk bulge resulting in mild narrowing of the left L4-5 foramen. Plaintiff was advised to discontinue narcotic medication, take Vioxx and ibuprofen, and undergo more physical therapy. (Tr. 114-115, 381, 264,112).

On December 19, 2002, Dr. Delahoussaye prepared a form submitted to the Workers' Compensation Administration listing Plaintiff's impairment rating. The form states that Plaintiff could lift 20 lbs occasionally, up to 10 lbs. frequently and could either walk or stand to a significant degree or sit most of the time with a degree of pushing or pulling arm or leg controls or motion, and could lift up to 10 lbs. occasionally or up to five lbs frequently, and occasionally walk or stand to carry out job duties. (Tr. 124). This description matches the definition of light work contained in the applicable regulations. 20 C.F.R. § 404.1567(b). Although there is no narrative portion of the form explaining the basis for these restrictions, on April 24, 2003, Plaintiff asked Dr. Delahoussaye to explain the impairment rating. Dr. Delahoussaye's note states:

> He has never had a positive EMG. He has been treated for contained disc herniations. There is no objection (sic) sign of radiculopathy. Reflexes are normal and there was no atrophy. He does in fact qualify as a category II lumbosacral impairment rating with pseudo radicular symptoms . . Mr. Leyba is still left with the fact that he now needs to pursue of (sic) employment within his work restrictions. . .he understands that he needs to be able to live with and cope with some of his residual symptoms.

Tr. 121.

The primary residual symptom addressed by Dr. Delahoussaye was pain. He provided Plaintiff with prescriptions for narcotic pain medication[9] and advised him to return to the office for injections of

---

[9]Hydrocodone and Darvocet -N 100.

Toradol[10] when he experienced "exhaustulations" of pain.  The court assumes he meant "exacerbations" of pain.

Plaintiff returned to the University of New Mexico Hospital in May 2003 complaining of worsening pain. His physical examination was relatively unremarkable, and he was referred to pain management. (Tr. 109).

Dr. Delahoussaye continued to see Plaintiff every four months, treating him with narcotic and antidepressant medications.[11]  (Tr. 119-120, 266-267). On April 19, 2004, Dr. Delahoussaye signed an application for impaired parking permit, stating that Plaintiff could not walk 100 feet without stopping to rest, and that this condition was permanent. (Tr. 269).  Plaintiff also sought care at emergency rooms for exacerbations of pain.[12]  On July 14, 2004, Dr. Delahoussaye advised Plaintiff not to go to the emergency room stating:

> I advised him that unless he was getting authorization to visit the emergency room that these visits would probably not be covered because his situation is not an emergency.  He has a chronic pain syndrome that does not require emergency room visits.  He states that he was aware of this and the emergency room also told him the

---

[10] A non-steroidal anti-inflammatory medication used to manage moderately severe acute pain that requires analgesia at the opioid level. *1999 Physicians' Desk Reference* pp. 2716-2720.

[11] July 31, 2003, Hydrocodone 5/500 & Darvocet-N 100; October 24, 2003, Hydrocodone 5/500, Darvocet-N 100, Lexapro, Neurontin; February 24, 2004, Hydrocodone 5/500, Darvocet-N 100, Lexapro, Neurontin; July 14, 2004, Hydrocodone 5/500, Darvocet-N 100, Lexapro, Neurontin. (Tr. 119-120, 266-267).

[12] On July 14, 2004, Plaintiff told Dr. Delahoussaye that he was going to the emergency room every 2-3 weeks to be treated for pain. (Tr. 266). The administrative record contains records from two emergency room visits from Gila Regional Medical Center dated July 25, 2004 and December 12, 2004. On the first visit Plaintiff was treated with injections of Demerol and Ativan. (Tr. 368-372). On the second visit he was treated with Flexeril and provided Fentanyl (Duragesic) patches. (Tr. 408-409). Demerol is a narcotic used to treat moderate to severe pain. http://www.drugs.com/demerol.html. Ativan may be prescribed for anxiety. http://www.drugs.com/ativan.html. Flexeril is a muscle relaxant. http://www.drugs.com/flexeril.html. Duragesic is a transdermal system which delivers an opioid analgesic over a 72 hour period for the treatment of chronic pain. *2003 Physicians' Desk Reference* pp. 1775.

same thing.  Despite this he has been going to the emergency room and has been paying cash to get the shots. . . . I have given him a prescription for Lidoderm[13] patches which he can use on his back if he has a severe exacerbation of pain and possibly this will reduce or prevent his nonauthorized visits to the emergency room.

(Tr. 266).

On October 14, 2003, David W. Joyce, a counselor with the State of New Mexico Division of Vocational Rehabilitation wrote a letter on Plaintiff's behalf.  Mr. Joyce stated his opinion that Plaintiff was not employable.  He based this opinion Plaintiff's complaints of pain, the inefficacy of pain medication and postural limitations not otherwise noted in the medical record.[14] (Tr. 103).

Plaintiff was evaluated by Carl Adams, PhD., on March 8, 2004, at the request of the Disability Determination Unit.  (Tr. 154-158). Dr. Adams performed a mental status examination, reviewed medical records and considered Plaintiff's use of pain medication.  Dr. Adams diagnosed a pain disorder and prepared a Statement of Ability to do Work-Related Activities, in which he indicated that Plaintiff had no limitations related to his psychiatric condition.

## Analysis

*1.     The opinions expressed by  Mr. Joyce.*

Plaintiff contends that the ALJ erred by ignoring the opinion of vocational counselor, Mr. Joyce.  In his letter of October 14, 2003, Mr. Joyce stated that Plaintiff was not employable.  This is a legal conclusion reserved to the Commissioner.  §§20 C.F.R.  404.1527(e)(1); 416.927(e)(1), *see Castellano*, 26 F.3d at1029 (holding that "responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]").   I find no error in the ALJ's disregard of Mr. Joyce's

---

[13]A Lidocaine (non-narcotic) patch used to treat neuralgic pain.  http://www.lidoderm.com.

[14]Inability to sit  for more than 15 minutes or stand for more than 10-15 minutes without exacerbation of pain.

9

opinion.

*2.      ALJ's pain and credibility assessments and application of the Grids*

Because ALJ combined her review of Plaintiff's credibility with her evaluation of his RFC, the court will address these issues together.

The court ordinarily defers to the ALJ as trier of fact on issues of credibility. *Thompson v. Sullivan,* 987 F.2d 1482, 1489 (10th Cir. 1993) (citations omitted). Deference it not, however, an absolute rule. *See Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987). The ALJ's credibility evaluation is subject to additional scrutiny, since she was not present at the administrative hearing to observe Plaintiff's demeanor. *Wyatt v. Barnhart*, 2006 WL 2458693, *3 (Okla.) (slip copy). Findings regarding credibility "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1131 (footnote omitted) (10th Cir. 1988). The adjudicator must "articulate specific reasons for questioning a claimant's credibility" where subjective pain testimony is critical. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotations omitted), *but see Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)(*Kepler* does not require formalistic factor by factor recitation of the evidence). In addition to discussing evidence supporting her decision, an ALJ must discuss "the uncontroverted evidence (s)he chooses not to rely upon, as well as significantly probative evidence (s)he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir.1996).

When determining the credibility of pain testimony, the ALJ should consider such factors as:

> . . .the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with

objective medical evidence."

*Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 and n. 7 (10th Cir. 1988); *accord Luna v. Bowen*, 834 F.2d 161, 165-66 (10th Cir. 1987) (citing *Turner v. Heckler*, 754 F.2d 326, 331 (10th Cir.1985)).

In accessing credibility and RFC, the ALJ summarized the medical procedures Plaintiff had undergone, including discogram, IDET, x-ray and MRI studies, and the results of those procedures. She cited to Dr. Delahoussaye's opinion that Plaintiff could perform light work and to his statement that he had counseled Plaintiff that he did not require emergency room visits. She referred to Plaintiff's statement to Dr. Delahoussaye that he was not interested in returning to work. She noted one inconsistency between Plaintiff's hearing testimony and the medical record related to his attempts to find other work[15], and recounted Plaintiff's testimony regarding his limited daily activities, his reliance on his wife for personal grooming assistance, his fear of walking/falling and complaints of constant pain despite use of pain medication. In rejecting Plaintiff's credibility, the ALJ stated:

> Mr. Leyba's hearing testimony regarding his alleged subjective complaints and functional limitations is extremely disproportionate to the objective medical evidence and the opinions of his treating sources, and is thus afforded little evidentiary weight. There is nothing to support that he requires personal assistance such was that he described. The medical evidence in this case is consistent in that there has never been a continuous twelve month period in which Mr. Leyba was not released by a treating physician to perform light or sedentary work activities. Within one year of his alleged onset date Mr. Leyba's primary treating physician, Dr. Delahoussaye. . . released him to "light" work . . .The is no indication that Mr. Leyba's back condition has objectively worsened since Dr. Delahoussaye released him to work at the light exertional level in March 2002. Dr. Delahoussaye has not amended his opinion on subsequent visits, nor is(sic) has this opinion been contridicted (sic) by any other treating physician.

---

[15]"Mr Leyba testified that he had not looked for work since his alleged onset date but that is in contrast to what he told Dr. Delahoussaye in July 2003.) (Tr. 21; compare Tr. 120 with Tr. 429).

(Tr. 21).

The ALJ never mentioned the uncontroverted evidence that all Plaintiff's medical care providers had credited his complaints of chronic pain, most prescribing narcotic medication to treat that pain. The ALJ did not discuss the inconsistency in Dr. Delahoussaye's records, that is, his opinion that Plaintiff could perform light work with the issuing of handicapped placards stating that Plaintiff's ability to walk was limited. Although she cited Dr. Delahoussaye's statement that Plaintiff did not need emergency room care to treat pain, the ALJ failed to note that Dr. Delahoussaye felt treatment for severe exacerbation of pain was warranted but that it could be handled in an office setting or with specific medications. (Tr. 121, 266). The ALJ may not pick and choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of nondisability. *Hamlin v. Barnhart* 365 F.3d 1208, *1219 (10th Cir.2004).

Given the deference I am required to give to the ALJ's credibility determination, these failures do not necessarily invalidate that determination. The same cannot be said for her application of the Grids. The evidence is uncontroverted that Plaintiff suffered from chronic pain with severe exacerbations of pain requiring treatment in addition to regularly prescribed narcotic pain medication. This level of pain is a non-exertional impairment which precludes conclusive application of the Grids. *See Thompson*, 987 F.2d at 1491-1942.

**Conclusion**

This matter is remanded to the Commissioner of Social Security for additional proceedings. The Commissioner shall reevaluate Plaintiff's claims as step five of the sequential evaluation process, obtaining the testimony of a vocational expert. Plaintiff will be permitted to introduce additional evidence.

                                        **Richard L. Puglisi**
                                **United States Magistrate Judge**
                                    **(sitting by designation)**